COURT OF APPEALS OF VIRGINIA


Present:  Judges Elder, Felton and Senior Judge Hodges
Argued at Chesapeake, Virginia


TEWANDA J. SMITH, S/K/A
 TEWANDA JOVEN SMITH

                                    MEMORANDUM OPINION[*] BY
v.    Record No. 2284-01-1        JUDGE WALTER S. FELTON, JR.
                                         NOVEMBER 5, 2002
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
                          Jerome James, Judge

              J. T. Stanton (J.T. Stanton, P.C. on brief),
              for appellant.

              Margaret W. Reed, Assistant Attorney General
              (Jerry W. Kilgore, Attorney General, on
              brief), for appellee.


     Tewanda Smith was convicted in a jury trial of (1)

second-degree murder, a lesser-included felony, in violation of

Code § 18.2-32, and (2) child neglect, in violation of Code

§ 18.2-371.1.  On appeal she contends that the evidence was

insufficient for a jury to find her guilty beyond a reasonable

doubt of second-degree murder.  For the following reasons, we

affirm the judgment of the trial court.

─────────────────────

     * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

## I.  BACKGROUND

### A.  OFFENSES

On the morning of July 8, 2000, Tewanda Smith walked into the Sentara Norfolk General Hospital emergency room, complaining of vaginal bleeding.  The triage nurse, Lynn Pantelides, asked Smith if she had a miscarriage and if she thought she was pregnant.  She answered no, explaining she had a fibroid tumor that ruptured.  Smith also informed Pantelides, upon questioning, that her last menstrual period was on June 20.  Thereafter, Pantelides pulled Dr. Raeann Hamilton aside and informed her about Smith.

Dr. Hamilton examined Smith and asked her what happened.  She responded that she had just given birth to a baby.  Dr. Hamilton then inquired about the tumor.  Smith told her that she was initially diagnosed as having a fibroid tumor, but a few days prior she was informed she was pregnant.[1]  After determining Smith had given birth, Dr. Hamilton began questioning her about such things as the baby's condition and location.

Smith expressed concern that her mother not find out she had given birth.  She then told Dr. Hamilton that she wrapped the baby up in some clothes and placed it in the backyard, near a low fence with chairs around it, to hide it from her mother.

---

[1] Kim Atkins, an x-ray technician at Healthsouth, testified that on July 5, 2000, she performed an ultrasound on Smith. Observing the baby and detecting its heartbeat, Ms. Atkins informed Smith that she was pregnant.

Smith again expressed her concern that if rescue workers were going to get the child, that they go through the backyard and not knock on the door and wake her mother. Dr. Hamilton left the examining room and called 911.

Rescue technicians arrived at Smith's house approximately thirty minutes after she arrived in the emergency room. Upon entering the backyard, they found Smith's child, Joshua, on a walkway near the trashcans. He was covered by a leather jacket and wrapped chest-high in a pair of sweatpants. The rescue technicians cleaned Joshua up, separated him from the placenta, and transported him to the hospital. On July 12, 2000, he died after being removed from life-support. Joshua's death was a result of blunt force head injuries and abandonment.

## B.  INVESTIGATION

On July 8, 2000, Detective T.R. Thompson interviewed Smith in the emergency room. In response to Detective Thompson's questions, Smith admitted that two days prior, during an examination at Healthsouth, she found out she was pregnant. She stated she was previously informed she had a fibroid tumor. Smith confirmed that she had given birth to Joshua in her bedroom. She stated she had him in her sweatpants then wrapped him in her coat.

Smith informed Detective Thompson that she left Joshua in the backyard because she wanted to get to the hospital in order for someone to get him. She wanted to give him up for adoption.

-

When Detective Thompson asked her why she had not taken the baby with her to the hospital, Smith replied that she could not let her mother see her get into the car with the baby. She feared being thrown out of her house if her mother found out she was pregnant.

That same morning, Smith was interviewed by a social worker from Child Protective Services, Priscilla Johnson-Boggs. Smith gave Ms. Johnson-Boggs an account similar to that given to Detective Thompson. She stated that she found out she was pregnant a few days prior, she delivered Joshua, and that she did not want to tell her mother because her mother would put her out of the house.

Ms. Johnson-Boggs interviewed Smith again on July 9, 2000. During that interview Smith stated she did not know it was a baby that she had wrapped in her jogging pants, but that she was "going to throw the pants in the garbage can which would have been easier, much easier."

The Office of the Chief Medical Examiner performed an autopsy and determined that the cause of death was "[c]omplications of blunt force head injuries and abandonment."

## C. TRIAL

On November 1, 2000, Smith was indicted for murder, in violation of Code § 18.2-32. At her jury trial, Smith recanted the statements she made to investigating authorities and medical

-

personnel.  She testified that when she arrived at the emergency room she told Dr. Hamilton everything that happened.

> Q [Mr. Sceviour, Smith's attorney]:  Dr. Hamilton comes through the door.  What transpires?  What occurs?
>
> A [Smith]:  I told her, I said, "Ma'am, I had a tumor, you know.  I was coming down [the] steps, [when] this happened."  And she was like, "Where is it?  What did you do with it?"  I said, "I just threw the pants out the back door."  She was, like, "Well, why didn't you bring it, you know, with you to the hospital?"  I was like, "I didn't want to, you know, touch it."  It was just a tumor.  I told her, you know, what happened.
>
> *    *    *    *    *    *    *
>
> Q:  At this point did you know you had had a baby?
>
> A:  No, sir.
>
> Q:  When was the first time you knew you actually had a baby?
>
> A:  Dr. Hamilton came back in there roughly fifteen minutes later, and she looked me dead in my face and said, "By the way, that was not a tumor, that was a baby."  And that was the first time that I had ever heard anything about a child.

On June 13, 2001, the jury found Smith guilty of second-degree murder, a lesser-included felony, in violation of Code § 18.2-32.  She was also found guilty of child neglect, in violation of Code § 18.2-371.1.

-

## II. ANALYSIS

On appeal, Smith contends that the evidence was insufficient for the jury to convict her of second-degree murder.  We disagree.

> When the sufficiency of the evidence is challenged on appeal, it is well established that we must view the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom.  The conviction will be disturbed only if plainly wrong or without evidence to support it.

Jones v. Commonwealth, 13 Va. App. 566, 572, 414 S.E.2d 193, 196 (1992).  The credibility of the witnesses and the weight accorded their testimony are matters solely within the province of the fact finder.  Long v. Commonwealth, 8 Va. App. 194, 199, 379 S.E.2d 473, 476 (1989).

Smith argues that the evidence did not prove beyond a reasonable doubt that she killed her newly born infant, Joshua, and that it was done with malice.  In order for the Commonwealth to convict Smith of second-degree murder, it must prove malice aforethought.  She must be shown to have "willfully or purposefully, rather than negligently, embarked upon a course of wrongful conduct likely to cause death or great bodily harm."  Essex v. Commonwealth, 228 Va. 273, 280-81, 322 S.E.2d 216, 220 (1984).

> Malice may be either express or implied . . . .  "Express malice is evidenced when 'one person kills another with a sedate, deliberate mind, and formed

-

design.' . . . Implied malice exists when any purposeful, cruel act is committed by one individual against another without any, or without great provocation; . . . ."

Id. at 280, 322 S.E.2d at 220 (quoting Pugh v. Commonwealth, 223 Va. 663, 668, 292 S.E.2d 339, 341 (1982)). "In making the determination whether malice exists, the fact-finder must be guided by the quality of the defendant's conduct, its likelihood of causing death or great bodily harm, and whether it was volitional or inadvertent . . . ." Id. at 282, 322 S.E.2d at 221.

In the case before us, we find that the evidence was sufficient for a jury to find beyond a reasonable doubt that Smith acted with malice. Smith's conduct was volitional and of a nature that presented a high likelihood of causing death or great bodily harm to her newly born infant. She discovered she was pregnant two days prior to giving birth, following an ultrasound examination at Healthsouth.

When Smith finally gave birth to Joshua, she deliberately wrapped him in her sweatpants and a jacket, went into the backyard, and left him helpless on the walkway near the trashcans. While Smith sought medical attention for herself, the newly born infant was left without medical care, still attached to the placenta and with multiple skull fractures.

Dr. Suzanne Starling, the Medical Director of the Child Abuse Program at the Children's Hospital of the King's

-

Daughters, and an expert in the field of child abuse, testified that the infant had a total of "at least eight fractures." She also testified that the type of multiple skull fractures found on Baby Joshua were consistent with blunt trauma, and would be similar in severity to head injuries one would expect to see where an infant went through a windshield in a head-on motor vehicle crash, or similar to cases where an automobile ran over a child's head, or where a person would stomp on a child's head.

Dr. Elizabeth Kinnison, Assistant Chief Medical Examiner, testified, consistent with the Report of Autopsy, that Baby Joshua suffered blunt force head injuries, including a comminuted skull fracture of the parietal bone, depressed skull fracture of the left parietal bone, and multiple linear fractures of the left parietal bone, right parietal bone, and right frontal bone. She opined that blunt force head injury and abandonment caused Baby Joshua's death.

When questioned by Dr. Hamilton, Detective Thompson, and Ms. Johnson-Boggs about what happened, Smith expressed no concern for Joshua, merely concern that her mother would throw her out of the house if she found out she was pregnant again. Her actions in abandoning the helpless infant were unquestionably deliberate and conscious. That Smith claimed at trial she believed she passed a tumor, contrary to the statements made to Dr. Hamilton, Detective Thompson, and Ms. Johnson-Boggs, is a matter of credibility to be determined by

-

the jury.  <u>Long</u>, 8 Va. App. at 199, 379 S.E.2d at 476.  The evidence was sufficient to sustain the conviction of second-degree murder.

The judgment of the trial court is affirmed.

<u>Affirmed.</u>